IRVING, P.J.,
for the Court:
¶ 1. On October 11, 2010, the Panola County Chancery Court terminated the parental rights of Erica Brown and Steve Hughes.[1] Feeling aggrieved, Erica appeals and argues that the chancery court erred in terminating her parental rights.[2]
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. Erica is the biological mother of Josh Brown and Kyle Hughes. Steve is the legal father of Kyle and the putative father of Josh. Josh was born on July 26, 2005, and Kyle was born on June 25, 2004. On September 19, 2005, Erica took Josh to his primary-care physician, complaining that he was “fussy” and had a fever. Josh had a seizure in the physician’s office and was airlifted to Le Bonheur Children’s Medical Center in Memphis, Tennessee. The doctors’ evaluations of Josh revealed cerebral edema, retinal hemorrhage, femur fractures, and a left-tibial fracture.[3] Based on Josh’s injuries, the hospital contacted the Panola County Department of Human Services (DHS).
¶ 4. DHS conducted an investigation and determined that Josh and Kyle should be removed from Erica’s care.[4] Additionally, criminal charges were brought against Erica based on Josh’s injuries. However, Erica’s trial resulted in a hung jury, and she was never tried again.
¶ 5. On July 21, 2006, the Panola County Youth Court adjudicated Josh and Kyle, along with three of their siblings, neglected.[5] Consequently, Josh and Kyle were placed in foster care.[6] In accordance with Mississippi Code Annotated section 43-15-13(4) (Rev.2009),[7] DHS met with Erica and *664 developed a service agreement. The service agreement required Erica to attend parenting classes, obtain psychological testing, attend counseling sessions, submit to random drug testing, seek employment, maintain a stable home, and attend monthly visits with Josh and Kyle. DHS informed Erica that reunification with Josh and Kyle was contingent upon successful completion of the service agreement. However, Erica refused to sign the service agreement and failed to fully comply with its requirements. As a result, the youth court determined that reunification with Erica was not in Josh’s and Kyle’s best interests and authorized the initiation of termination proceedings.
¶ 6. DHS filed a petition to terminate Erica’s parental rights based on several grounds, including her alleged abuse of Josh, her failure to comply with the service agreement, and the erosion of her relationship with both Josh and Kyle. On July 22, 2010, the chancery court held a hearing on the petition. Amanda Pittman, a DHS social worker, testified that while Erica called at least once a month to schedule visitation with Josh and Kyle, she had missed scheduled visits on more than one occasion. Pittman testified that Erica’s “sporadic” visitation had resulted in the erosion of her relationship with Josh and Kyle.
¶ 7. Pittman further testified that she had met with Erica to develop a service agreement and that Erica knew that Josh and Kyle would not be returned to her unless she fully complied with the plan. According to Pittman, Erica had secured stable housing and had undergone a psychological evaluation, but she had failed to comply with the other requirements of the service agreement. Based on Erica’s “sporadic” visitation and her failure to complete her service agreement, Pittman believed that termination of Erica’s parental rights was in Josh’s and Kyle’s best interests.
¶ 8. Ronald Windsor, the guardian ad litem (GAL), also testified that termination of Erica’s parental rights was in Josh’s and Kyle’s best interests. Windsor testified that he interviewed Erica as part of his investigation, but he admitted that he had never met Josh or Kyle. According to Windsor, he was scheduled to meet the children during one of Erica’s scheduled visitations, but she had cancelled the visit. Windsor testified that Erica lacked the responsibility to be a successful parent. Windsor further testified that the children had bonded with their foster parents and noted that Josh and Kyle had been in foster care longer than they had been in Erica’s care.
¶ 9. Erica, who appeared pro se, denied any responsibility for Josh’s injuries. Additionally, she claimed that she had completed parenting classes and had applied for a part-time job. However, she admitted that she had not provided DHS with documentation of her efforts. Erica testified that she had attended scheduled visitation with Josh and Kyle. She admitted to cancelling visits on occasion, but claimed that she always notified DHS in advance. Finally, Erica testified that she had moved into her grandfather’s home and that his home would provide a stable environment *665 for Josh and Kyle.[8]
¶ 10. Additional facts, as necessary, will be related during our analysis and discussion of the issue.
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 11. Mississippi Code Annotated section 93-15-103(3) (Rev.2004) sets forth the grounds for involuntary termination of parental rights. The party seeking termination of parental rights must prove “at least one of the grounds enumerated” by clear and convincing evidence. S.R.B.R. v. Harrison County Dep’t of Human Servs., 798 So.2d 437, 443 (¶ 24) (Miss.2001). Even where one of the grounds for termination is proven by clear and convincing evidence, the trial court must still consider whether “termination is in the best interest ] of the child.” Id. A trial court’s finding that “the best interest of the [child] favors termination” must be supported by “substantial evidence.” J.C.N.F. v. Stone County Dep’t of Human Servs., 996 So.2d 762, 767 (¶ 17) (Miss.2008).
¶ 12. DHS sought to terminate Erica’s parental rights based on the following grounds:
A parent has been responsible for a series of abusive incidents concerning one or more childrenf.]
[T]he parent fails to eliminate behavior, identified by the child[-]caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child[-]caring agency to assist the parent[.]
* * *
[T]here is an extreme and deep-seated antipathy by the child toward the parent or ... there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment[.]
The child has been adjudicated to have been abused or neglected and custody has been transferred from the child’s parent(s) for placement pursuant to [Mississippi Code Annotated] [s]eetion 43-15-13 [ (Rev.2009) ], and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
Miss.Code Ann. § 93-15-103(3)(c), (e)(ii), (f) & (h).
¶ 13. On July 21, 2006, the youth court adjudicated Josh and Kyle neglected and ordered that they be placed in DHS custody. DHS placed Josh in foster care and placed Kyle in the care of his paternal grandmother, Hughes. However, after Hughes returned Kyle to DHS, the agency placed him in foster care. In 2008, the youth court determined that reunification with Erica was not in Josh’s or Kyle’s best interests.[9] Based on these facts, there was sufficient evidence to terminate Erica’s parental rights on the basis of section 93 — 15—103(3)(h). However, our inquiry does not end here. We must next consider whether there is substantial evidence to *666 support the chancery court’s finding that termination of Erica’s parental rights was in Josh’s and Kyle’s best interests.
¶ 14. “It is well-established that [an appellate court] will affirm a chancellor’s findings of fact if there is substantial evidence to support them....” J.C.N.F., 996 So.2d at 765 (¶ 10) (citation omitted). “This standard of review is highly deferential to the chancellor,.who has the opportunity to hear all the testimony and observe the demeanor of all witnesses firsthand.” Id. Given the highly deferential standard of review, we cannot say that the chancery court erred in finding that termination of Erica’s parental rights was in Josh’s and Kyle’s best interests.
¶ 15. Prior to seeking termination, DHS attempted to enter into a service agreement with Erica and reunite her with Josh and Kyle. However, Erica refused to sign the service agreement. Nonetheless, DHS continued to work with Erica in an effort reunite her with her children. In fact, DHS did not seek termination of Erica’s parental rights until 2009-almost four years after the children were removed from her care. During that time, Erica had numerous opportunities to sign a service agreement with DHS and comply with its terms, yet she failed to do so. Based on Erica’s failure to implement a service agreement with DHS, the youth court determined that reunification was not in Josh’s and Kyle’s best interests.
¶ 16. The chancery court also heard testimony from Pittman and Turner that termination of Erica’s parental rights was in the children’s best interests. Both pointed to Erica’s failure to complete a service agreement or cooperate with DHS as a basis for their conclusions that the children’s best interests favored termination. Additionally, the GAL testified that Erica lacked the responsibility to be a successful parent and opined that termination of her parental rights was in the children’s best interests.
¶ 17. Based on the above, there was substantial evidence to support the chancery court’s finding that termination of Erica’s parental rights was in Josh’s and Kyle’s best interests. Consequently, the chancery court did not err in terminating Erica’s parental rights.
¶ 18. THE JUDGMENT OF THE PA-NOLA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANO-LA COUNTY.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR.

. Because of the confidential nature of this case and to protect the privacy of the minor children involved, we have used fictitious names for the minor children and their family members.

. Steve did not appeal the chancery court’s judgment.

. As a result of his injuries, Josh is confined to a wheelchair, is non-verbal, and will never be able to live independently.

. DHS did not include a report from its investigation. The only testimony regarding DHS's findings came from its social worker, Tina Turner, who testified that DHS "did an assessment and determined that the children were not safe in the home...."

. The three other siblings were placed with their respective fathers and were not named in DHS’s petition to terminate Erica's parental rights.

. In November 2006, DHS placed Kyle in the care of his paternal grandmother, Jane Hughes. However, Hughes later returned Kyle to DHS custody, stating that Erica had failed to provide any financial assistance and that she could not afford to care for him without Erica’s help.

. Section 43-15-13(4) provides, in pertinent part:
In the case of any child who is placed in foster care on or after July 1, 1998, except in cases of aggravated circumstances prescribed in [Mississippi Code Annotated] [s]ection 43-21-603(7)(c) or (d), the child’s natural parent(s) will have a reasonable time to be determined by the court, which *664 shall not exceed a six-month period of time, in which to meet the service agreement with the department for the benefit of the child unless the department has documented extraordinary and compelling reasons for extending the time period in the best interest of the child. If this agreement has not been satisfactorily met, simultaneously the child will be referred to the appropriate court for termination of parental rights and placement in a permanent relative's home, adoptive home[,] or a foster/adoptive home.

. Erica testified that her two other children, ages one and four, also live in the home.

. The youth court entered orders with its determinations on February 1, 2008, and September 10, 2008, for Kyle and Josh, respectively.